IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* MATTHEW A. FITZER, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> ALLERGAN, INC., *et al.* <br><br> Defendants. | * <br> * <br> * <br> *    UNDER SEAL <br> * <br> *    Civil Case No. 1:17-cv-00668-SAG <br> * <br> * <br> * <br> * <br> * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

In this False Claims Act ("FCA") case, Defendant Allergan, Inc. ("Allergan") filed a motion for sanctions, alleging that Relator Matthew A. Fitzer, M.D. and certain of his trial counsel, Rebekah L. Bailey, Esq., Matthew H. Morgan, Esq., Chloe Raimey, Esq., and Anthony C. Munter, Esq., should be sanctioned as a result of misrepresentations made to the Court in Relator's Fourth Amended Complaint ("FAC"), ECF 127, and opposition to the motion to dismiss the FAC, ECF 136. The record relating to this issue is extensive, consisting of the parties' original briefing, ECF 214, 252, a motions hearing on February 14, 2024, ECF 281, a telephone status conference, ECF 296, a series of affidavits filed by Relator's trial counsel, ECF 302, 303, 304, 308, briefing by attorneys retained to represent Relator and his counsel ("sanctions attorneys"), ECF 305-1, 307-1, 313-1, an omnibus response filed by Allergan, ECF 322, and replies filed by the sanctions attorneys, ECF 329, 330, 331. This Court has reviewed the entirety of the record with great care in light of the importance of this issue. For the reasons stated below, while an exceptionally close call, Allergan's motion for sanctions will be DENIED.[1]

---

[1] The parties will have one week to review this memorandum opinion, confer, and jointly suggest redactions that should be made before this opinion is publicly filed.

I.       **PROCEDURAL AND FACTUAL BACKGROUND**

This *qui tam* case, originally filed in 2013 and transferred to the District of Maryland in 2017, remained under seal for many years awaiting the government's decision regarding whether or not to intervene. Ultimately, on February 5, 2021, the government notified this Court and Relator that it did not intend to intervene and pursue this case. ECF 48. Shortly thereafter, Relator retained Nichols Kaster, PLLP to join his original attorney, Mr. Munter of Price Benowitz, LLP, as trial counsel. Ms. Bailey and Mr. Morgan of Nichols Kaster, along with Mr. Munter, filed Relator's Second Amended Complaint ("SAC") on May 21, 2021. ECF 77.

The essence of Relator's claim is that Allergan submitted false Medicare claims because it employed its online surgeon locator ("Locator") as a "kickback" to induce surgeons to use its LAP-BAND adjustable gastric band. One of the many difficulties relating to the required proof in this case is the fact that Medicare uses a single provider reimbursement code, 43770, for all adjustable gastric-banding procedures. During the relevant time periods, there were at least two adjustable gastric bands on the market: Allergan's LAP-BAND and Ethicon's REALIZE band. In order, then, to plead a viable FCA claim against Allergan, Relator had to allege, with particularity, "presentment" of at least one false claim, specifically, that a surgeon had implanted a LAP-BAND (not a REALIZE band) and submitted a false claim to Medicare for reimbursement. To this end, Relator's SAC incorporated two tables intended to identify specific false claims presented to the government related to payment for LAP-BAND (not REALIZE band) surgeries.[2] The paragraph introducing the tables in the SAC (and later in the Third Amended Complaint ("TAC")) simply

---

[2] One of the two tables, the "2013 Table," is relevant to Allergan. The other table, from a later time period, is only relevant to Allergan's then co-Defendant and is not at issue in this motion.

states: "The physicians below exclusively performed LAP-BAND surgeries and appeared on Defendants' physician locator tool in 2013." ECF 77 ¶ 214; ECF 100 ¶ 319.

After Relator filed his SAC, the case proceeded through a series of successful efforts by Allergan (and its then co-Defendant Apollo Endosurgery, Inc.) to dismiss the action. This Court wrote no fewer than five memorandum opinions, over the span of eleven months, on the adequacy of the various versions of the Complaint, concluding, in relevant part, that Relator's SAC and TAC had to be dismissed.[3] ECF 91, 98, 118, 125, 140. With respect to the TAC, this Court dismissed it in part because Relator had not adequately alleged presentment. *See, e.g.*, ECF 118 at 13 (March 22, 2022, opinion dismissing the TAC stating, "Although Relator asserts that the surgeons included in the tables were not qualified to perform REALIZE band surgeries, neither the TAC nor any of Relator's briefing has explained or provided any factual basis for that conclusion. . . . In the absence of any fact-based allegations to support that claim, this Court cannot assume the truth of Relator's conclusory assertion that the tables represent claims related to LAP-BAND surgeries rather than REALIZE band surgeries."). In connection with Relator's motion for reconsideration of this Court's dismissal of the TAC, this Court stated:

> On this point, the FAC [Fourth Amended Complaint, which had already been drafted for filing despite the pending motion for reconsideration] again displays the irony of this motion for reconsideration. Over and over again, Relator has alleged and argued that the surgeons listed in the tables in the TAC were not qualified to perform REALIZE band surgeries. As it turns out, though, the FAC alleges that Relator removed one of the surgeons from the tables after doing more research and discovering that the surgeon may have been REALIZE band certified after all. Surprisingly, notwithstanding that admission in the FAC, Relator continues to argue in this motion that the surgeons listed in the tables in the TAC were "not Realize certified." . . . . But to survive a motion to dismiss, he must allege *facts* that, taken as true, support his theory. He may not simply espouse that theory, relying on facts that do not support it, and ask this Court to credit its truth.

---

[3] A sixth memorandum opinion followed shortly thereafter denying Allergan's motion to certify order for immediate interlocutory appeal. ECF 154.

3

ECF 125 at 8 n.4 (emphasis in original) (internal citations omitted). Despite these concerns, this Court did not deem it appropriate to dismiss Relator's action with prejudice, instead allowing him to file the FAC to exercise "one final opportunity to plead a viable claim." ECF 118 at 21.

With Court permission, then, Relator filed his FAC on May 18, 2022. ECF 127. For the first time, the FAC changed the operative language regarding Relator's explanation of his 2013 Table to state, "Dr. Fitzer has personal knowledge from his investigations (explained further below) that the physicians below exclusively performed LAP-BAND® gastric-band surgeries and had listings on Defendants' physician locator tool in 2013." *Id.* ¶ 371. The FAC went on to describe Relator's "investigations" as follows, in relevant part:

> 373. Dr. Fitzer identified the providers in the two tables above were not Realize® band qualified (and therefore could not have implanted a Realize® band) through a process of elimination. Specifically, in or about March of 2013 and again in November of 2014, Dr. Fitzer compiled a list of all self-reported gastric-band surgeons from the American Society of Metabolic and Bariatric Surgeons ("ASMBS").
>
> 374. Next, he determined which of those surgeons had listings on www.lapband.com by searching the LAP-BAND® locator for each name.
>
> 375. From this list of surgeons, he proceeded to eliminate those who were Realize® band certified. He did this by first confirming whether the surgeons appeared on the Realize® locator.
>
> 376. By studying whether the many bariatric surgeons of his acquaintances had Realize® locator listings, Dr. Fitzer learned that when a surgeon lacked a Realize® locator listing, it very reliably indicated that they did not have Realize® certification.
>
> 377. Dr. Fitzer thus eliminated about half his list.
>
> 378. If Dr. Fitzer did not find the LAP-BAND® Specialist on www.realize.com he subsequently located the provider's professional website, online profiles, and listings on obesityhelp.com and bariatricpal.com. On these sites, it was common practice for bariatric surgeons to provide their accreditation status, including whether they had a Realize® band certification. Dr. Fitzer removed any surgeon for whom he could find evidence of Realize® band certification.

ECF 127 ¶¶ 373–78 (footnotes omitted).

Allergan filed a motion to dismiss the FAC. ECF 131. In its motion, Allergan spent multiple pages discussing, at least in part, the adequacy of Relator's 2013 Table and accompanying investigation. *See* ECF 131-1 at 6–7, 11-13, 19–24. Relator filed an opposition to the motion in which he represented:

> Relator took **great care** when compiling these two tables so to only include claims data for surgeons who (a) were not Realize band qualified **based on his extensive contemporaneous research and personal knowledge**, and (b) were listed on Defendants' locator **during the time the services were rendered**. The FAC details the steps Relator took early on to gather the evidence in question, demonstrating a reliable basis of support for the allegations in question. These steps included compiling ASMBS data on gastric band surgeons, narrowing the list to surgeons listed on the LAP-BAND locator, and then eliminating those who were listed on the Realize locator or marketed themselves as Realize certified.

ECF 136 at 18 (emphases added) (internal citations omitted). In its opinion denying Allergan's motion to dismiss the FAC, this Court specifically warned Relator (and, by extension, those representing him) as follows:

> It is also worth noting more generally that Relator has been concerningly inconsistent about his level of certainty that the claims referenced in the data tables of each iteration of his complaint in fact correspond to LAP-BAND surgeries. First, he was sure that all the claims referenced in the tables *only* corresponded to LAP-BAND surgeries because the listed surgeons were not Realize band certified and, therefore, they *exclusively* performed LAP-BAND surgeries. ECF 77 ¶¶ 214-15. Then, he realized that at least one surgeon was Realize band certified after all, and it appears as though Allergan may have found a few more. ECF 131-1 at 20-21. And now, he commits only that the "vast majority, if not all" of the claims correspond to LAP-BAND surgeries. ECF 136 at 18. This is still a motion to dismiss, so this Court must assume the truth of Relator's allegations (although not those that are demonstrably false), but Relator should be far more discerning about his representations to this Court in the future. If he is certain of something, he is of course free to represent that. But Relator now finds himself in the precarious position of having admitted that representations he made both in his pleadings and in numerous briefs were demonstrably false.

ECF 140 at 13 n.3 (emphasis in original). Once again, this Court held that Relator's FAC "falls far short of alleging with particularity that any of the claims represented in the tables, in fact,

5

correspond to LAP-BAND surgeries. Without any certainty that these claims correspond to LAP-BAND surgeries in the first place, they do not demonstrate that any false claims were 'necessarily' presented." *Id.* at 14. However, this Court found that other specific allegations included in the FAC, relating to a particular surgeon, Dr. Richard DiCicco, sufficed to allege presentment of at least one false LAP-BAND claim and allow the case to proceed to discovery. *Id.* at 15–18.

Discovery then ensued. When Allergan deposed Relator, he testified, in relevant part, as follows:

- Relator added the information about his investigations to the FAC because "the fact that I had – I've seen these people on the locator in 2013 and '14 was not accepted as good enough, for some reason." ECF 214-6 at 247:5–7 (Dep. Tr. of Matthew A. Fitzer).

- After speaking with Mr. Didio at Allergan in March, 2013, and becoming aware of the quota policy, Relator began looking at Lapband.com Locator listing results in regions across the United States. *Id.* at 249:19–23. His goal at that time was "to confirm the – you know, the magnitude of the scheme." *Id.* at 250:2–5. In late spring 2013, he printed out a list of more than one thousand surgeons from the ASMBS website and then went page-by-page marking by hand whether each surgeon was on the LAP-BAND Locator. *Id.* at 251:3–252:3, 254:12–15. The investigation occurred in March and April of 2013 and took about six to eight hours. *Id.* at 261:20–262:2.

- Relator either threw away or otherwise did not preserve that hand-marked list within weeks of preparing it in spring 2013. *Id.* at 253:4–12, 255:2–7.

- Relator has no existing records or other documentation regarding the research he performed in 2013 with the ASMBS list. *Id.* at 263:4–16.

- The only information in the FAC that was informed by the work that Relator did in 2013 was "the Lap-Band status of those people on that locator – or on that chart, rather." *Id.* at 284:22–285:3. Relator further testified that because he was a "habitual peruser of Lapband.com's locator," *id.* at 286:25, he could not say for sure with respect to many names whether he saw them in 2013 as opposed to 2012 or some other time. *Id.* at 278:15–289:7, 291:12–292:9.

Allergan then filed the instant motion for sanctions, arguing that Relator's deposition demonstrates that his statements in the FAC regarding his 2013 Table, and his personal knowledge of the surgeons' status in 2013, were false. *See* ECF 214-1. Among other arguments, Allergan

established that at least two of the names listed in Relator's 2013 Table definitively *did not* appear on the LAP-BAND Locator in March or April of 2013: Kevin Martin because he is not a surgeon at all, and Dr. Carlos Godinez because he performed his first proctored LAP-BAND surgery in October, 2013, months after Relator's "investigation" of the Locator in the spring. *Id.* at 13. After Relator's deposition during which he described his investigative efforts, Allergan can demonstrate conclusively that Relator had no basis for knowing (personally or otherwise) not only whether the surgeons on his 2013 Table held REALIZE certifications in 2013, but also whether they even appeared on Allergan's Locator in 2013.

After reviewing the motion, this Court required additional information regarding each counsel's role in the preparation of the disputed filings. Ms. Bailey filed a declaration in which she asserted:

- Prior to the filing of the SAC, attorneys from the Nichols Kaster firm had at least ten calls and conferences with Relator. During one such call, a Nichols Kaster attorney (who did not later sign the pleadings) reviewed a spreadsheet entitled "2013 Medicare Database All Lapbands Spreadsheet" with Dr. Fitzer. ECF 302 ¶¶ 12–13 (Rebekah L. Bailey Decl.).

- During another call, the same attorney spoke with Relator about the data that would be used to create the tables, and Relator provided details about his process for identifying surgeons. *Id.* ¶ 14.

- Ms. Bailey and the attorney who spoke directly to Relator drafted the language in the SAC that stated, "The physicians below exclusively performed LAP-BAND surgeries and appeared on Defendants' physician locator tool in 2013." *Id.* ¶ 21. Relator reviewed that language before filing. *Id.*

- With respect to the TAC, the language introducing the 2013 Table remained the same. *Id.* ¶ 25. In response to the motion to dismiss the TAC, Relator sent Mr. Morgan, Ms. Raimey, Mr. Munter, and Ms. Bailey comments, including information regarding his "2014 Realize crosscheck used to create the 2013 and 2014 charts" and a "five-page single-space written explanation of his investigatory process, including his Realize research." *Id.* ¶¶ 27–28.

- When the TAC was dismissed, and Relator was afforded two weeks to propose a FAC, counsel reviewed the information it already had and considered new

7

- information and clarifications provided by Dr. Fitzer. *Id.* ¶ 29, 33. The FAC was drafted by the same attorney who did not later sign it and edited by Ms. Raimey and Ms. Bailey. *Id.* ¶ 34. Mr. Munter also provided some edits and comments. *Id.* ¶ 35.

- Relator himself provided "comprehensive edits" to the FAC and discussed the FAC with counsel. *Id.* ¶ 36. Counsel had extensive back and forth with Relator regarding the information included in the tables. *See id.* ¶¶ 38–41.

- During Nichols Kaster's "independent cross-check research into the Realize certification status of the surgeons listed" in the 2013 Table, they "uncovered post-investigation materials that could be used to suggest Dr. McEwen may have been Realize certified at some time." *Id.* ¶ 47. After discussion amongst the attorneys and Relator, they removed Dr. McEwen from the 2013 Table in the FAC. *Id.* ¶¶ 52–53.

- The FAC language introducing the 2013 Table was changed to read:

  Dr. Fitzer has personal knowledge from his investigations (explained further below) that the physicians exclusively performed LAP-Band gastric-band surgeries and had listings on Defendants' physician locator tool in 2013. *Id.* ¶ 48.

  That language was "reviewed and edited by all counsel, with the exception of Matt Morgan, as well as Dr. Fitzer." *Id.* ¶ 49.

- When Ms. Bailey signed the FAC, she "believed counsel (including [her]self) had undertaken a reasonable inquiry into Dr. Fitzer's allegations. *Id.* ¶ 55. While she went on to acknowledge that clearer wording could have avoided the present issue, she attested that she "still believe[s] the allegations to be accurate as stated and, in any event, presented in good faith." *Id.*[4]

## II.    LEGAL STANDARDS

Allergan requests sanctions pursuant to two legal bases. First, Allergan asks this Court to invoke its inherent authority to sanction Relator and his counsel.[5] "Federal courts possess certain

---

[4] The declarations filed by Ms. Raimey, Mr. Morgan, and Mr. Munter are less detailed than that filed by Ms. Bailey and are essentially consistent in terms of their content. *See* ECF 303, 304, 308. This Court therefore declines to summarize them in greater detail.

[5] Allergan initially did not seek sanctions against Relator's counsel under the Court's inherent authority, however, following submission of the attorney affidavits and related briefing, Allergan did request sanctions against Relator's counsel under this theory. *See* ECF 322 at 17.

inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (internal quotation marks and citations omitted); *see Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019) (explaining that district courts "have the inherent power to order sanctions to preserve the integrity of the judicial process and to punish bad-faith conduct intended to delay or disrupt the course of litigation or to impede enforcement of a court order" (internal quotation marks and citation omitted)). "Sanctions may be awarded only in the face of misconduct of some sort." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 146 (4th Cir. 2020). Put another way, the degree of bad faith required to justify sanctions pursuant to the Court's inherent authority is whether the filings "involve fraud, deceit, misrepresentation, harassment and unethical conduct." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 281 (4th Cir. 2022). "Under the inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). The Supreme Court has noted that the inherent power to sanction "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980).

Second, Allergan asks this Court to rely on Fed. R. Civ. P. 11 to sanction Relator and his trial counsel. A signature on a complaint signifies the attorney's certification that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support." FED. R. CIV. P. 11(b)(3). Under this rule, "If an attorney signs a complaint without undertaking the necessary investigation, Rule 11 provides that the district court 'shall' impose sanctions." *Cleveland Demolition Co. v.*

*Azcon Scrap Corp.*, 827 F.2d 984, 987 (4th Cir. 1987). Unlike in the context of the Court's inherent authority, the Fourth Circuit has clearly stated that under Rule 11, an objective bad faith standard applies. As the Fourth Circuit has explained,

> The rule further provides that, if a pleading is signed in violation of the rule, the court "*shall* impose upon the person who signed it, a represented party, or both, an appropriate sanction." This court has held that the proper inquiry in ruling on Rule 11 motions is whether "a reasonable attorney in like circumstances would believe his actions to be factually and legally justified." If the actions of an attorney or a party fail to meet this standard, an award of sanctions is mandatory under the rule.

*Artco Corp. v. Lynnhaven Dry Storage Marina, Inc.*, 898 F.2d 953, 956 (4th Cir. 1990) (emphasis in original) (citations omitted). That standard "does not require malice or ill will; 'reckless indifference to the law will qualify. If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious.'" *Stradtman v. Republic Servs., Inc.*, 121 F. Supp. 3d 578, 582 (E.D. Va. 2015) (quoting *Collins v. Dollar Tree Stores, Inc.*, Civ. No. 2:09cv486, 2010 WL 9499078, at *3 (E.D. Va. May 28, 2010)).

While the Fourth Circuit has never provided clear guidance on the burden of proof in sanctions proceedings, as another judge of this Court recently reasoned:

> To prove the misconduct, however, courts have employed the heightened standard of clear and convincing evidence, rather than a mere preponderance of the evidence. *See, e.g.*, *DeWitt*, 2021 WL 915146, at *4; *Glynn v. EDO Corp.*, JFM-07-01660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010). In *Glynn*, Judge J. Frederick Motz explained, *id.*:
>
> Whether it is sought under the Federal Rules of Civil Procedure or pursuant to this Court's inherent power, the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit. However, proving misconduct occurred by "clear and convincing" evidence, as opposed to by a mere preponderance, certainly suffices. *See Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("The burden of proof issue need not be resolved here because the district court's bad faith finding is supported by clear and convincing evidence." (internal citations omitted)); *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995) (citing several other circuits in holding that the "clear and convincing" standard is

10

> required to impose default judgment, whereas preponderance is the standard for imposing less dramatic sanctions); *Balcar v. Bell and Assoc., LLC*, 295 F.Supp. 2d 635, [640] (N.D.W.Va. 2003) ("Because the court's inherent power to sanction should be exercised with caution and discretion, some circuits have held that clear and convincing evidence of bad faith and vexatious behavior is required for a court to exercise its inherent authority to sanction. Although the Fourth Circuit appears not to have addressed the issue, this Court believes it, too, would adopt the clear and convincing evidence standard with regard to the [c]ourt's inherent power to sanction." (internal citations omitted)).

*Johnson v. Balt. Police Dep't*, Civ. No. ELH-19-0698, 2022 WL 9976525, at *36 (D. Md. Oct. 14, 2022) (alterations in original). Thus, this Court will apply a clear and convincing standard to the facts at issue.

### III. ANALYSIS

#### A. The False Statement

As a threshold matter, this Court addresses the falsity of paragraph 371 of the FAC, which reads:

> Dr. Fitzer has personal knowledge from his investigations (explained further below) that the physicians below exclusively performed LAP-BAND gastric-band surgeries and had listings on Defendants' physician locator tool in 2013.

ECF 127 ¶ 371. In their briefing, the sanctions attorneys argue extensively about what this Court views as a red herring—whether information gleaned from an after-the-fact investigation can constitute "personal knowledge?" *See* ECF 305-1 at 11. This Court concurs with the sanctions attorneys on that point and takes no issue with the notion that an after-the-fact investigation can, in some circumstances, provide the basis for "personal knowledge." Relator need not have been an eyewitness to the surgeries in 2013 or the submission of Medicare claims relating to the surgeries to have personal knowledge about what happened. In fact, had Relator conducted the entirety of his 2013 and 2014 investigations in 2013, and maintained records or some other reliable

11

means of recalling what he learned in 2013, this Court would have no issue with the veracity of paragraph 371.

However, based on the facts that have now been revealed (and were known to Relator and counsel when they drafted and filed the FAC and opposition to the motion to dismiss), paragraph 371 is provably false. In March and April of 2013, Relator reviewed the Locator listings and compared them to the ASMBS list, not to try to memorize the surgeons on the list, but to try to ascertain the approximate percentage of surgeons that had been removed from the Locator. *See* ECF 214-6 at 250:2–15, 256:4–10 (Dep. Tr. of Matthew A. Fitzer). He checked off names common to the Locator and the ASMBS list and he wrote down some names from the Locator that did not appear on the list. *Id.* at 258:3–259:5. By his own description, he did not employ the "rigor that . . . would have made [him] want to save" the marked-up list. *Id.* at 253:9–12. He then left his copy of the ASMBS list, with his check marks and notes, in a bin on a desk, and threw it away shortly after creating it in the spring of 2013. *Id.* at 253:4–12, 255:5–7. It is therefore fair to say that at some point in 2013, Relator had some (less than rigorous) personal knowledge of which physicians had listings on Allergan's physician locator tool as of March and April of 2013.

But that concluded his investigation until November of 2014. At that time, he (along with his assistant) embarked upon a more organized, documented effort to determine which physicians were listed on Allergan's Locator and which also had REALIZE band certifications. *Id.* at 270:9–83. That better-documented effort included a surgeon-by-surgeon inquiry to see whether they were listed on REALIZE's locator and, if not, to check their web pages for evidence they performed REALIZE procedures. *Id.* at 278:6–11; ECF 214-5 at 10–11. The fatal problem is that this effort, beginning in late 2014, could not possibly determine whether a physician had been (1) listed on the Allergan Locator at any point in 2013 or (2) listed on the REALIZE locator (or otherwise

advertising REALIZE certification) at any point in 2013—the year Relator alleged Allergan submitted false claims to the government. As is evident in this case, a company's locator listings can be changed at any time for a variety of reasons. Relator himself concedes that he was removed from Allergan's Locator twice without his knowledge, despite the fact that he continued to be LAP-BAND certified. *See* ECF 214-6 at 156:3–20 (Dep. Tr. of Matthew A. Fitzer). Similarly, surgeons can change their practices and, correspondingly, the services they advertise. They can have a bad experience with a particular device or product and decide not to use it anymore. Relator offers no evidence regarding REALIZE's management of its locator to allow this Court to infer when and how surgeons were added and/or when and how surgeons were removed. In the absence of such evidence, neither this Court *nor Relator* could draw any reasonable inference that the absence of a surgeon from the REALIZE locator in late 2014 indicated that the surgeon had exclusively performed LAP-BAND gastric-band surgeries in 2013. Similarly, an unscientific review of a surgeon's website in late 2014 could not provide an indicator of what that surgeon did or did not do the year prior. Relator therefore had no personal knowledge from his belated investigation what types of surgeries any of the listed surgeons performed in 2013. To the extent he was drawing unsubstantiated inferences from information he reviewed in future years, that speculation cannot amount to "personal knowledge" regarding what happened in 2013.

Moreover, it is clear that Relator did not retain personal knowledge, at the time he prepared the 2013 Table (sometime in or after 2015), about which physicians "had listings on Defendants' physician locator tool in 2013." His claim that his "personal knowledge" derived from his memory of the comparison he did between the Locator and the ASMBS list in March and April, 2013 is provably false. Two of the entries in the 2013 Table in the FAC, as Relator now concedes, did not appear on the Locator in March or April of 2013: one because he was not, in fact, a surgeon and

13

one because he was not yet qualified as of spring 2013. *See* 214-2 ¶ 14 (John D. W. Partridge Decl.); ECF 214-9. Those examples demonstrate the implausibility of the suggestion that Relator could possibly have remembered particular surgeon names from the expansive review of the Locator he conducted for an entirely different purpose in March, and April, 2013. And he conceded in his deposition that as a regular "peruser" of the Locator, he could not differentiate in his memory what he saw in 2013 from other times. ECF 214-6 at 286:24–25, 287:23–25, 289:4–7 (Dep. Tr. of Matthew A. Fitzer). Thus, it is clear that he did not rely on his memory, or any other "personal knowledge," from his less-than-rigorous spring 2013 investigation to compile the 2013 Table he presented in the FAC.

Accordingly, this Court finds by clear and convincing evidence that paragraph 371 in the FAC contains a false statement regarding Relator's personal knowledge. This Court next turns to whether this false statement warrants sanctions in this case.

### B. The Court's Inherent Authority to Sanction Relator and His Counsel

In this Court's view, the circumstances here do not warrant sanctions under the Court's inherent authority. For better or worse, this Court harbored enough suspicion about the reliability of Relator's "investigation" relating to the 2013 Table to decline to rely upon it to find presentment. *See* ECF 140 at 14. Instead, this Court relied on other allegations Relator made in his FAC, relating to surgeries performed by Dr. DiCicco, to allow the case to proceed to discovery. *Id.* at 15–18.[6] Relator's representations about the 2013 Table, then, did not actually advance the case along the path to discovery, although Relator clearly intended them to do so. In this Court's view, then, the

---

[6] Allergan requests that the Court view Relator's allegations about Dr. DiCicco "through the lens of his evident deception about the 2013 Table," and conclude that those allegations are similarly false. ECF 214-1 at 16–17. The Court declines Allergan's invitation because, unlike Relator's representations about the 2013 Table, his allegations about Dr. DiCicco were not provably false.

abuse of process here (perhaps luckily for Relator) does not rise to the level warranting sanctions. The prejudice to Allergan was limited to its unnecessary efforts responding to the false representation regarding Relator's "personal knowledge" of the standing of the surgeons "in 2013."

Similarly, this Court rejects the notion that trial counsel intentionally deceived this Court. While, as detailed below, reasonable minds could disagree about whether counsel conducted an objectively reasonable investigation of the facts before drafting or approving the FAC and the opposition to the motion to dismiss, there is a distinct difference between an intentional attempt to deceive and an attempt at zealous advocacy that inadvertently crosses a line between truth and falsehood. The four attorneys have no prior record of disciplinary actions, and all have attested that they acted in good faith. While this Court is disturbed by what appears to be an indefensible continued insistence that the provably incorrect assertions in the FAC were "accurate," *see, e.g.*, ECF 302 ¶ 55 (Rebekah L. Bailey Decl.), in totality, this Court accepts that counsel acted in good faith.

Additionally, the instant record does not support bad faith or intentional conduct on the part of Relator. Instead, it suggests the distinct possibility here that Relator simply misunderstood the import of this Court's rulings on presentment and what he needed to prove. At his deposition, Relator expressed confusion regarding why his initial conclusory assertions about who he saw on the Locator were insufficient. ECF 214-6 at 246:16–247:7 (Dep. Tr. of Matthew A. Fitzer). The significance of "who he saw when" did not seem to be a matter of great import to Relator, although it is ultimately determinative of whether paragraph 371 can be a truthful statement. He believed he had "personal knowledge" from his investigation and failed to realize he could not have it.

15

There is also no evidence that Relator deceived his attorneys about the facts underlying his investigation. The inaccuracies in the documents result from phrasing and description. And the filings were drafted by counsel, although reviewed and approved by Relator. The description of the investigation in the FAC is vague regarding the sequence of events. This Court would submit that the average reader would read the FAC as this Court did: to suggest that Relator completed the entirety of his investigative process twice, once in 2013 and once in 2014, to come up with the information to include in both tables. This Court concedes, however, that the text does not compel that reading. While the language chosen is far from precise, the ambiguity could be consistent with good faith lawyerly efforts to present the facts in the light most favorable to their client, even if this Court might believe that those efforts stepped too close to the line between truth and misrepresentation. And Relator was entitled to rely on his counsel's presentation of the investigations, even if intentionally ambiguous, so long as not intentionally misleading. On this record, then, this Court cannot find, by clear and convincing evidence, subjective bad faith or intent to mislead as required to exercise its inherent authority to sanction Relator or his attorneys.

## C. Rule 11

As noted above, the assessment of counsel's actions under Rule 11 turns on objective reasonableness: considering all of the circumstances of this case, did counsel conduct "an inquiry reasonable under the circumstances" before they signed the FAC and the opposition to Allergan's motion to dismiss the FAC? FED. R. CIV. P. 11(b). While an exceptionally close question, this Court again cannot conclude by clear and convincing evidence that the standard has been violated.

In assessing whether counsel's inquiry was "reasonable under the circumstances," this Court first looks at what counsel did in March, 2022, during the two weeks allotted to prepare the FAC. Counsel attests that they "added many additional allegations to address the Court's

concerns," including "a detailed explanation of Relator's investigations that lead to the 2013 and 2014 charts," ECF 302 ¶ 30 (Rebekah L. Bailey Decl.); "considered many pieces of information and documents in putting together the" FAC, *id.* ¶ 33; and "performed additional, independent cross-check research into the Realize certification status of the surgeons listed in the" tables,[7] *id.* ¶ 47. Counsel also edited paragraph 371 to include the offending "personal knowledge" assertion. *Id.* ¶¶ 48–50.

The Nichols Kaster attorney who did not sign the pleadings drafted the FAC, although Ms. Raimey, Ms. Bailey, and Mr. Munter edited the draft. *Id.* ¶¶ 34–35. Relator also spoke primarily with the attorney who did not sign the pleadings, though there were email exchanges and exchanges of memoranda also involving Ms. Bailey, Ms Raimey, and Mr. Munter. *Id.* ¶¶ 36–38, 40, 42.

In addition to counsel's multi-step inquiry, this Court also considers that counsel submitted the proposed FAC after having been afforded just two weeks to do so in this Court's order dismissing the TAC. ECF 141. The short window of time in which the inquiry had to be performed weighs in favor of trial counsel in an assessment of whether their inquiry was reasonable. Of course, counsel had the standard amount of time to prepare their opposition to the motion to dismiss the FAC, in which they used the term "contemporaneous" to describe Relator's 2013 investigation despite the fact that it had occurred over a series of years. Counsel asserts that they intended the term to mean relatively "contemporaneous" as compared to 2021, rather than

---

[7] The utility of this step makes little sense to this Court because investigating in 2022 which surgeons were or were not REALIZE certified in 2013 seems even less fruitful than investigating that question in 2014 or 2015. However, it does appear that the Nichols Kaster attorneys were able to find some evidence that one surgeon listed on the chart, Dr. McEwen, may have been REALIZE certified "at some time," ECF 302 ¶ 47 (Rebekah L. Bailey Decl.), leading to his removal from the 2013 Table. That discovery did not apparently give trial counsel pause about adding the "personal knowledge" representation, though.

17

suggesting that the entire investigation happened in 2013. *See* ECF 302 ¶ 61 (Rebekah L. Bailey Decl.). Again, the imprecise word choice resulted in a statement (or at least a clear impression) that is untrue.

Ultimately, this is a case in which there were multiple attorneys engaging in conversations with the client (including one who had the most contact with the client but did not ultimately sign the filings), multiple attorneys editing each filing, and ambiguous language regarding the process of Relator's investigation. Those facts do not establish, by clear and convincing evidence, that any particular attorney who signed the filings conducted an objectively unreasonable inquiry. Under even a preponderance of the evidence standard, this Court may have reached a different conclusion about the reasonableness of counsel's actions. But under a clear and convincing standard, this Court cannot disregard the evidence that the falsehoods resulted not from an inadequate investigation, but simply ill-advised attempts at zealous advocacy and poor wording choices in an attempt to salvage, under a short timetable, their client's case. Relator's trial counsel are cautioned, however, that future such inaccuracies and imprecision will be viewed with a less forgiving eye.

Finally, even though "it may be appropriate under the circumstances of the case to impose a sanction on the client," under Rule 11(c), such circumstances are not present here. FED. R. CIV. P. 11 advisory committee's notes to 1983 amendment; *see Instant Tax Serv. 10060, LLC v. TCA Fin., LLC*, Civ. No. PJM 08-2364, 2009 WL 2579806, at *3 (D. Md. Aug. 17, 2009). "[A] represented party can only be sanctioned under Rule 11(c)(1) if the court determines that their attorney has violated Rule 11(b) and that the party is responsible for the violation." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5A FEDERAL PRACTICE AND PROCEDURE CIV. § 1336.2 (4th ed. 2023). Thus, because the Court finds no violation of Rule 11(b), it has no basis to sanction Relator himself under Rule 11.

## IV.  CONCLUSION

As sometimes happens when applying legal standards to a particular set of facts, the result of this motion does not sit entirely well with this Court. Relator, with the assistance of trial counsel, submitted a FAC and subsequent briefing containing provably false information regarding his personal knowledge, causing Allergan and this Court to expend significant time (and Allergan to expend significant money) in response. Had this Court either relied on the 2013 Table to find that the FAC survived dismissal or cautioned Relator and counsel before the FAC had been drafted about the need for precision in making these factual assertions, at least Rule 11 sanctions would have been warranted. In the present posture, however, given the burden of proof applicable to sanctions motions, the law provides no obvious recourse. While it may be cold comfort to Allergan, the information Allergan gleaned about Relator's investigation during discovery will be of use to Allergan, as this Court intends to permit Allergan to question Relator about his Table-related representations in his FAC, and the investigation leading to those representations, at the trial of this matter. However, for the reasons set forth above, Allergan's motion for sanctions must be DENIED. A separate order follows.

Dated: May 30, 2024                                  /s/
                                                     Stephanie A. Gallagher
                                                     United States District Judge