IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br> *ex rel.* MATTHEW A. FITZER, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> ALLERGAN, INC., *et al.* <br><br> Defendants. | * * * * * * * * * * * * | UNDER SEAL <br><br><br> Civil Case No. 1:17-cv-00668-SAG |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Relator Matthew A. Fitzer ("Relator") filed this case against Defendant Allergan, Inc. ("Allergan"), alleging that Allergan conducted a kickback scheme violative of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, by maintaining a surgeon locator ("Locator") on its website for its LAP-BAND gastric banding product. ECF 1. This Court has ruled, both in court hearings and in written opinions, on myriad motions, including the parties' cross-motions for summary judgment. *See* ECF 327, 344. This memorandum opinion memorializes a more detailed explanation regarding the April 5, 2024, in-court denial of both parties' cross-motions for summary judgment on the issue of causation.[1]

I.  **RELEVANT FACTS**

Allergan maintained a website, Lapband.com, to advertise the gastric banding product it acquired in 2006, the LAP-BAND. ECF 191-8 at 29:11–22 (Dep. Tr. of Randal Price). The Locator, one of the features on Lapband.com, allowed users to type in a geographic identifier to obtain listings of local LAP-BAND certified surgeons. ECF 194-6; ECF 191-7 at 53:14–24 (Dep.

---

[1] The parties will have one week to review this memorandum opinion, confer, and jointly suggest redactions that should be made before this opinion is publicly filed.

Tr. of Michael Oberg). The Locator described the criteria a surgeon had to meet to obtain certification, which included the "commitment and ability to perform at least 25 LAP-BAND® System procedures each year (about two per month)." ECF 210-29.

Beginning in 2007, Allergan added "icons" to its Locator to indicate that a surgeon met certain additional criteria beyond just certification. *See* ECF 193-32; ECF 194-31; ECF 195. By at least November, 2008, the Lapband.com website explained each icon to Locator users. For example, the "Experience" icon reflected a surgeon who completed at least 75 LAP-BAND surgeries the prior year. ECF 210-30. The "Faculty Member" icon marked surgeons who had proctored new surgeons performing their initial LAP-BAND surgeries.[2] ECF 210-31. The "LAP-BAND TOTAL CARE" icon showed that a surgeon had completed Allergan's Total Care training program. ECF 210-32. Allergan removed the "Experience" and "Faculty Member" icons from its locator in or around June, 2010. ECF 211-19.

In 2008, all proctored LAP-BAND certified surgeons were added to the Locator. ECF 192-29. No surgeons were removed from the Locator unless Allergan's account managers specifically requested that a surgeon be removed and obtained approval from upper-level management at Allergan. *Id.* In late 2009 and into 2010, Allergan executives and the company's executive council began discussing implementing a volume-based criteria, counted on a rolling basis, for inclusion on the Locator. ECF 210-16 ¶¶ 54–56 (Vernon Vincent Aff.). Eventually, they decided to use a 25 surgery-per-year quota, which mirrored the commitment surgeons made when they began training. *Id.* ¶ 57. Once that decision was made, Allergan began some informal process of removing the

---

[2] While the theory behind the use of the "Experience" icon to drive sales is self-evident because a surgeon would need to perform a large number of surgeries to garner and retain the icon, it is unclear how Relator could establish that Allergan's use of the other icons "sat in the causal chain" leading to any particular Medicare claim.

2

names of surgeons who had not performed 25 LAP-BAND procedures during the previous calendar year, with the exception of new surgeons who had just completed their LAP-BAND training and proctoring or had recently opened a new LAP-BAND focused practice. *Id.* ¶ 64; ECF 191-1 at 53:5–54:10 (30(b)(6) Dep. Tr. of James Caggiano). Account managers still identified, on a somewhat ad hoc basis, candidates for removal, as opposed to a systematic purge. *See* ECF 191-2 at 76:10–77:2 (Dep. Tr. of James Caggiano); ECF 211-32; ECF 211-33. As a result, of the 1,105 surgeons on the Locator in May, 2011 (well after the 25 LAP-BAND criterion had been enacted), only 579 had performed more than 25 LAP-BAND surgeries in the prior year. ECF 211-37. By May 31, 2011, though, Allergan had removed enough surgeons to have only 781 listed. ECF 193-11.

In 2011, Allergan executives, along with the executive council, considered a new proposal to restrict the Locator to surgeons who (1) performed 50 or more LAP-BAND procedures in the previous year, (2) whose LAP-BAND procedures represented 50% or more of their bariatric procedures in the previous year, or (3) were new customers expected to reach one of those two prior criteria within one year. ECF 193-12 at 7. After approval by various Allergan departments including medical, legal and compliance, and regulatory, Allergan implemented the new criteria on August 8, 2011. *See* ECF 211-22; ECF 211-23. This time, Allergan prepared in advance to remove all surgeons who did not meet the criteria as of August, 2011. ECF 211-22. Prior to that time, account managers distributed the new criteria to listed surgeons in their territory who appeared to qualify (a total of roughly 800 surgeons), asking them to certify that they met at least one criterion. ECF 193-12; ECF 211-43 at 34. Allergan removed surgeons who failed to complete the certification from the Locator but did not further notify the surgeons of their removal. ECF 211-27 at 2. Allergan has introduced testimonial evidence that from August, 2011 until November,

3

2012, the new criteria including the 50 LAP-BAND quota appeared in writing on the Lapband.com website. *See* ECF 210-15 ¶¶ 7–10 (Randal Price Aff.); ECF 191-2 at 84:20–85:6 (Dep. Tr. of James Caggiano). Relator disputes that evidence, citing the absence of a preserved or archived capture of the website during that time. ECF 191 at 22 n.20.

In November, 2012, Allergan again adjusted its criteria to include doctors who either (1) performed 40 or more LAP-BAND procedures during the prior year or (2) whose LAP-BAND procedures represented 40% or more of all bariatric procedures they performed in the past year. ECF 191-11 at 6–7. Allergan also still included new surgeons who began implanting LAP-BANDs within the past year. *Id.* It also permitted listings for surgeons who had proctored others on use of the LAP-BAND, regardless of whether they met any other criteria, and surgeons who recently began to implant LAP-BANDs instead of REALIZE bands. *Id.* Despite the changed criteria, Allergan did not provide surgeons with notification of the change and did not require any attestation. ECF 211-27; *see* ECF 211-39. Allergan removed the earlier criteria (including the requirement of more than 50 surgeries) from its Locator. Price Aff. ¶ 20.

Allergan sold the LAP-BAND device in December, 2013. ECF 210-1 at 10 (citing Allergan's Form 10-K Annual Report Dec. 31, 2013)).

## II.    LEGAL STANDARDS

### A.   Legal Background

For the purpose of the issues to be addressed in this opinion, this Court assumes, without deciding, that Allergan's use of its Locator qualified as a "kickback" to surgeons under the Anti-Kickback Statute ("AKS"). As such, this opinion focuses on whether those "kickbacks" met the causation standard required to prove false claims and a resulting FCA violation.

As this Court has explained in its earlier opinions, in 2010, Congress amended the AKS to provide that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). The present dispute surrounds the applicable standard of causation imposed by the phrase "resulting from." This issue has created a circuit split in the federal courts. Allergan again urges, as it has in previous motions, that this Court should adopt the standard recently used by the Eighth Circuit and hold that when a relator seeks to prove an AKS-based FCA claim, the relator "must prove that a defendant would not have included particular 'items or services' but for the illegal kickbacks." *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 836 (8th Cir. 2022) (quoting 42 U.S.C. § 1320a-7b(g)). The Sixth Circuit recently agreed with the *Cairns* decision and adopted the but-for standard. *See United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052–55 (6th Cir. 2023). Under the but-for standard, in a case of this nature, Relator would be required to present claim-by-claim evidence of each surgeon's subjective motivation for each LAP-BAND surgery, to establish that the surgeon would have made a different decision regarding each patient's treatment in the absence of the Locator's incentivization.

### B. This Court's Adoption of a Causation Standard

Recognizing that the Fourth Circuit has not yet opined on the appropriate causation standard for an AKS-based FCA claim, this Court continues to believe that the more persuasive opinion was issued by the Third Circuit in *United States ex rel. Greenfield. v. Medco Health Solutions, Inc.*, 880 F.3d 89, 100 (3d Cir. 2018). As the *Greenfield* court explains in detail, the legislative history of the 2010 amendments to the AKS indicates that Congress intended to make it easier, not harder, to bring (and ultimately prove) FCA claims predicated on violations of the AKS. *Id.* at 96–97. The Third Circuit also explained that Congress intended to avoid the

"incongruous" result where but-for causation would be required to prove an AKS-based FCA case, but a defendant could be convicted criminally under the AKS itself on proof of less than but-for causation. *Id.* Despite the fact that the Sixth Circuit has now joined the Eighth Circuit in adopting the but-for causation standard, then, and in the absence of contrary guidance from the Fourth Circuit, this Court believes that the "middle of the road" approach continues to be the course best aligned with the statutory language and scheme.

Under the "middle of the road" approach, "a kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." *Id.* at 100. "'A link is required, but it is less than' showing that the bribe succeeded in producing the prescription." *United States v. Teva Pharms. USA, Inc.*, No. 13 Civ. 3702 (CM), 2019 WL 1245656, at *24 (S.D.N.Y. Feb. 27, 2019) (quoting *Greenfield*, 880 F.3d at 98). As the U.S. District Court for the District of Massachusetts also explained:

> [A] claim is false if it seeks reimbursement for a prescription that was not provided in compliance with the Anti-Kickback Statute, regardless of whether the claim was the result of a quid-pro-quo exchange or would have been submitted even absent the kickback. *See Greenfield*, 880 F.3d at 96. Relators need not show that a quid pro quo exchange occurred, or that the physicians would not have prescribed Defendant's medication but for the kickbacks. It is sufficient to show that Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs, even if the physician would have prescribed those drugs absent the kickback.

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*, Civ. No. 12-cv-10601, 2018 WL 1996829, at *3 (D. Mass. Apr. 27, 2018). "In other words, Relators need only show that the [defendants'] referral . . . actually sat in the causal chain." *Teva Pharms.*, 2019 WL 1245656, at *24 (internal quotation marks and citations omitted).

After this Court's ruling at the motion to dismiss stage regarding the applicable causation standard, ECF 140 at 18–21, both parties moved for summary judgment on the issue of causation and what standard should apply. Allergan continued to maintain that a but-for standard is the proper standard of causation, citing the new opinions from other circuits. ECF 210-1 at 46 n.36. Relator, for his part, espoused the position that this Court had already rejected a but-for standard and only required evidence that the Locator "sat in the causal chain" leading to the surgery. *See* ECF 245 at 33–35. Purportedly applying that standard, Relator sought summary judgment as to causation with respect to six surgeries (performed by four surgeons) where Relator proffered some evidence to establish that, at some point, those four surgeons knew they were on the Locator. *Id.* at 36–37.

As this Court explained in an oral ruling during the motions hearing on April 5, 2024, neither party summarized the causation standard in alignment with this Court's view, as it has now been informed by discovery and further argument. ECF 334 at 46:12–16 (Apr. 5, 2024, Hr'g Tr.). Allergan's re-argument for application of the but-for standard is unavailing because this Court remains persuaded that its initial standard is correct. Relator purports to advocate for the standard this Court had adopted but then misapprehends its import: simply showing that a surgeon knew he was on the Locator at some point is not enough to place the Locator "in the causal chain" leading to the false claim. This Court therefore denied summary judgment to both parties and writes this opinion to provide additional guidance regarding its views on the causation standard and how it applies to the facts of this case.

### III. Evidence Required to Create a Genuine Issue of Material Fact Regarding Causation

During the summary judgment process, for the first time, Relator clarified that his pre-2010 claims do not rely on the existence of a quota required for inclusion on the Locator, which was the

7

theory set forth in the FAC. Instead, Relator now premises his pre-2010 claims on Allergan's "icon" system, contending that incentivizing surgeons to perform more LAP-BAND surgeries to attain icon status constituted an unlawful kickback. Relator argues the quota theory only for post-2010 conduct. Each theory, and the evidence required to create a genuine issue of material fact, is addressed below.

### A. Quota Claims

Under the "middle of the road" approach, to show that the referral/kickback (in this case, the Locator) sat in the causal chain leading to a false Medicare claim, Relator needs to prove less than "the surgery would not have happened but for the Locator" but more than "the Locator existed, the surgeon was on the Locator, and the surgery happened." As this Court described at the motions hearing, for the Locator to have served as an inducement that sat in the causal chain leading to a false Medicare claim, there needs to be evidence of four facts: (1) that the surgeon was on the Locator at a proximate time around the surgery; (2) that the surgeon knew he or she was on the Locator at that time; (3) that the surgeon knew at that time that some prescription-based criteria existed to get on or remain on the Locator—in other words, that the surgeon recognized the need to perform more LAP-BAND operations to derive the benefit from being on the Locator; and (4) that the surgeon then performed a LAP-BAND surgery and a Medicare claim ensued.[3] Evidence of each of those four things is required to create a genuine issue of material fact as to whether the

---

[3] Logically, the surgeon's knowledge that there are surgery-based criteria for inclusion on the Locator must predate the surgery in order to show plausible inducement. For example, Relator cannot cite a surgery performed in 2010 as having been "induced" where his first evidence that the surgeon knew of a quota occurred when Allergan disseminated the information about its new quota in 2011. In some instances, Relator makes that mistake in the evidence he submitted regarding the six surgeries—he cites post-surgery communications as evidence of the surgeons' knowledge regarding their Locator status. Such evidence will not suffice when this Court reviews the supplemental summary judgment filings.

Locator sat in the causal chain for the particular Medicare claim tied to that surgery. The absence of evidence of any of those four facts would make summary judgment for Allergan appropriate as to a particular claim.

Relator has described this standard as a "shift" in this Court's earlier description of the relevant causation standard. ECF 335 at 5. Of course, at the motion to dismiss stage, this Court is required to accept all of Relator's factual allegations as true. And in his FAC, Relator alleged far more regular communication between Allergan and the surgeons on the Locator than the evidence he actually offered at summary judgment. In particular, the FAC alleges that surgeons were "aware of the value of their free marketing" because Allergan "emailed surgeons a 'Daily Summary of Seminar Registrations,'" sent "them email alerts showing leads generated from the locator" and "seminar sign-ups," and provided surgeons with "a lead tracker spreadsheet for surgeons to use on their own." ECF 127 ¶¶ 9, 168–69. Those assertions sufficed, taken as true, to establish universal surgeon knowledge of their Locator status, at least under the low bar applicable at the motion to dismiss stage.

But at the summary judgment stage, the evidence proffered by Relator fell far short of meeting that standard. Relator offered, generally, a collection of email correspondence between Allergan and certain surgeons and/or their offices. ECF 191-17; ECF 191-18. Collectively, those surgeons represent just a small percentage of the overall number of surgeons on the Locator. More importantly, though, the discovery regarding Relator's own knowledge of his listings on the Locator conclusively disproved universal knowledge. Relator himself conceded that he had no knowledge of his listing status up until he requested inclusion in the Locator in 2012 and began relying heavily on Locator referrals for his new business. ECF 214-6 at 156:3–157:12, 167:6–10 (Dep. Tr. of Matthew A. Fitzer). Relator's lack of knowledge is corroborated by other individual

surgeons who submitted declarations to Allergan attesting to their own lack of knowledge or attention to their Locator status. *See* ECF 210-21 ¶ 8 (Dr. John Olsofka Aff.); ECF 210-18 ¶¶ 9–12 (Dr. George Fielding Aff.); ECF 210-19 ¶¶ 9–11 (Dr. Adam Smith Aff.). In other words, Relator has not submitted evidence to create a genuine issue of material fact as to universal or even widespread knowledge by surgeons of their Locator listing status. Thus, surgeon-by-surgeon proof is required.[4]

Of course, the four-factor standard this Court announced at the hearing is a more precise explication of the causation standard than described in its earlier opinions, which referred more generally to surgeon knowledge without the same level of granularity. But the evidence adduced by Relator as to all but six individual claims did not even attempt to meet that less precise "knowledge" standard—Relator offered no specific evidence of surgeon knowledge other than a random smattering of email communications that, except for the six claims, are not then tied to any particular LAP-BAND surgeries.[5] Surgeon-by-surgeon, claim-by-claim analysis is required

---

[4] This Court is not suggesting, of course, that case-by-case proof is required in every FCA case. In a more traditional "kickback" situation, for example a company's policy to pay a monetary inducement to surgeons for performing a surgery, there could be no question that the surgeons would know they received money and would know why. But on these facts, the alleged kickback is continued placement on the Locator, that for at least a significant period of time, included every surgeon certified to use the medical device. "Inducement" is only plausible where the party intended to be induced is aware of the facts that might cause him to alter his behavior. On these facts, there is a significant chance that surgeons were not.

[5] The six claims on which Relator sought summary judgment provide useful examples regarding what will or will not suffice to survive summary judgment under this Court's standard. For example, as to one surgeon, Dr. Quaid, Relator cites a claim relating to a surgery he performed in October, 2009. The only communication Relator cites prior to that surgery is an introductory email Allergan sent to Dr. Quaid in March, 2008 explaining the Locator's features but making no mention of a quota or of icons. ECF 245-28. Dr. Quaid's knowledge in March, 2008 that he was being added to the Locator does not suggest that the Locator had any causal connection to a surgery he performed a year-and-a-half later. Absent additional evidence showing that Dr. Quaid knew of some requirement that he had to perform more LAP-BAND surgeries before his October, 2009 surgery, this Court would grant summary judgment for Allergan on that claim. With respect to

under the fact pattern of this case, to establish that the Locator sat in the causal chain for any particular operation and resulting claim.

Further, mere knowledge by a surgeon that he or she is listed on the Locator does not suffice, because all certified surgeons originally received Locator listings. At least until 2011, surgeons did not need to take any action to keep those listings, although some may have been removed (without notice) through Allergan's ad hoc process. Simply being listed on the Locator (or even knowing about that listing) is not enough to "sit in the causal chain" without creating some plausible incentive for a surgeon to perform a LAP-BAND surgery.

### B. Icon Claims

As noted above, Relator has now seemingly abandoned his quota-based theory for pre-2010[6] claims, in recognition of the fact that, during that era, Allergan did not enforce a quota and listed all certified surgeons on the Locator, subject only to ad hoc removal.[7] Instead, during that

---

another surgeon, Dr. Marley, Relator moved for summary judgment on claims relating to three surgeries: November, 2010, May, 2011, and January, 2012. While Relator cites several instances of communication between Allergan and Dr. Marley regarding the Locator and establishes that Dr. Marley had icons, the surgeries in question all post-dated the icons, so the icons did not incentivize these three surgeries. The only communication establishing knowledge of the quota would be the general August, 2011 communication to all surgeons, which post-dated two of the surgeries in question. Therefore, only the January, 2012 surgery would survive summary judgment and proceed to trial.

[6] Relator's clarification with respect to the nature of his pre-2010 claims occurred in the context of the parties' discussion regarding the FCA's public disclosure bar, which Congress amended in 2010. This Court assumes, however, that most of Relator's remaining quota-theory claims will be in and around 2011, when Allergan widely disseminated information to listed surgeons regarding its new quota system.

[7] As far as this Court can tell, the existing record provides only one example of a surgeon being informed, prior to 2011, of any quota. Specifically, Relator submits an email from Dr. Moses K. Shieh in 2009 in which he challenges his ad hoc removal from the Locator for having "minimum to no volume of LAP-BAND® bands placed in the last 6 months." ECF 191-17 at 123. However, Relator offers no evidence that Dr. Shieh submitted any Medicare claims for LAP-BAND surgeries after he learned of the requirement to place some number of bands to retain Locator status.

11

earlier time frame, Relator now seeks to rely on a new theory first raised in Relator's summary judgment papers—the theory that Allergan used the "icon" feature of Lapband.com to induce surgeons to perform more surgeries to improve their placements and listings on the Locator. The causation evidence required to survive summary judgment for this type of claim will closely resemble that required for a quota-theory claim, specifically evidence that: (1) the surgeon was listed on the Locator at approximately the same time as a surgery; (2) the surgeon knew of the Locator listing at that time; (3) the surgeon knew of the criteria required to attain or maintain icon status; and (4) the surgeon performed a LAP-BAND surgery resulting in a Medicare claim.

## IV.   CONCLUSION

For the reasons set forth above, this Court denied both parties' motions for summary judgment on the issue of causation. Typically, a failure to show a genuine issue of material fact regarding the element of a claim is fatal at the summary judgment stage, without further process. However, because this Court clarified its detailed causation requirements for the first time at the April 5, 2024, hearing, this Court afforded Relator an opportunity to submit an updated supplement to his summary judgment motion, which must include evidence of each of the four required facts for each claim Relator intends to pursue. ECF 343. The parties have proposed a schedule and will submit supplemental summary judgment materials as to causation regarding the individual claims Relator hopes to pursue at trial. Upon receipt and review of those materials, this Court will determine the number of claims that survive summary judgment and can proceed to trial.

Dated: June 3, 2024                              /s/
                                        Stephanie A. Gallagher
                                        United States District Judge