IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MATTHEW A. FITZER, M.D., | * * * * | |
| Plaintiffs, | * | |
| v. | * * | Civil Case No. 1:17-cv-00668-SAG |
| ALLERGAN, INC., *et al.* | * * | |
| Defendants. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Relator Dr. Matthew Fitzer ("Relator") filed this False Claims Act ("FCA") lawsuit against Defendant Allergan, Inc. ("Allergan") in 2013, alleging that Allergan's LAP-BAND Surgeon Locator constituted a kickback to its listed surgeons. After multiple rounds of briefing, including one initial round of summary judgment briefing, this Court announced a four-factor causation standard and allowed the Parties to submit supplemental summary judgment briefing (and evidence) applying that standard on a surgery-by-surgery, claim-by-claim basis. ECF 343. Relator submitted supplemental evidence and, after a telephone conference, amendments to his supplemental submissions to address this Court's questions for the Parties. ECF 361–64, 369, 374. Allergan has filed a renewed Motion for Summary Judgment applying the four-factor standard. ECF 381. Relator opposed the motion, ECF 389, and Allergan submitted a reply memorandum. ECF 396. No hearing is necessary. *See* Loc. R 105.6 (D. Md. 2023). For the reasons described below, Allergan's motion will be granted in part and denied in part. The surgeries and claims remaining for trial are listed in an appendix to this opinion.

I.  **DISCUSSION**

Recognizing that the Fourth Circuit has not yet opined on the appropriate causation standard for an Anti-Kickback Statute ("AKS")-based FCA claim, this Court adopted the "middle of the road" approach taken by the Third Circuit in *United States ex rel. Greenfield. v. Medco Health Solutions, Inc.*, 880 F.3d 89, 100 (3d Cir. 2018). ECF 353 at 5–6. Under the "middle of the road" approach, "a kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." *Greenfield*, 880 F.3d at 100. Applying that standard to this case, in a prior opinion this Court explained exactly what evidence Relator must adduce to create a genuine issue of material fact as to causation for a particular procedure and claim. ECF 353 at 8. The factors are: (1) that the surgeon was on the Locator at approximately the time of the surgery; (2) that the surgeon knew she[1] was on the Locator at that time; (3) that the surgeon knew at that time that some prescription-based criteria existed to get on or remain on the Locator—in other words, that the surgeon recognized the need to perform more LAP-BAND operations to derive the benefit from being on the Locator; and (4) that the surgeon then performed a LAP-BAND surgery and a Medicare claim ensued. ECF 353 at 8.

This Court has recounted the facts of this long-enduring lawsuit numerous times, and most recently in its opinion denying the Parties' first cross-motions for summary judgment. ECF 353. Here, the Court will address the facts relevant to causation, considered in the light most favorable to Relator as the non-moving party, applied to the four-factor test it has previously outlined.

---

[1] For simplicity, this Court will use feminine singular pronouns for unnamed surgeons, recognizing that surgeons may be of any gender.

Applying that test, Relator argues that 4,309 surgeries survive summary judgment, and Allergan argues that just 38 procedures survive.

This Court will analyze the fourth factor, which appears to dispose of the largest number of procedures, first. This the Court will then discuss the factors for the three categories of surgeries as Allergan has divided them—"icon-period claims," "interim-period claims", and "quota-period claims."

1. **LAP-BAND Surgeries Performed and Submitted to Medicare**

The fourth factor requires that Relator evidence a genuine issue of material fact as to whether each individual surgery was a LAP-BAND procedure and a claim was submitted to Medicare. Allergan argues that the vast majority of surgeries can be disposed of on this factor.

   a. *LAP-BAND v. REALIZE*

Although the Centers for Medicare and Medicaid Services ("CMS") collect data about the total number of bariatric procedures billed to CMS, because "both Realize and LAP-BAND implantations were submitted to CMS for reimbursement using the [same]…code," it is challenging to parse which procedures used LAP-BANDs. ECF 381-1. Everyone agrees that the 862 procedures for which Allergan possesses business reply card ("BRC") data were LAP-BAND procedures, not REALIZE procedures. ECF 381-1 at 8–9; ECF 389 at 25–26. The parties diverge thereafter: Relator would add several other categories of procedures to the list, and Allergan argues that there is no other reliable indicator that a particular procedure used a LAP-BAND.

Relator's first argument relates to the "Ethicon spreadsheet," which was produced in discovery by Ethicon Endo-Surgery, the company that sold the REALIZE band. Ethicon described the spreadsheet as showing "the names and attendees at training events related to REALIZE bands from January 1, 2007 to December 31, 2015." ECF 362-100. Relator argues that the Ethicon

3

spreadsheet constitutes a comprehensive list of surgeons trained to use the REALIZE band, and thus that any surgeon *not* on that spreadsheet could only have been performing LAP-BAND procedures. ECF 364 ¶ 14 (citing ECF 190-7). In addition, Relator argues that this Court should presume that any surgery performed prior to the date of a surgeon's REALIZE training must have been a LAP-BAND procedure. With the addition of these procedures, Relator's count would reach 3,353 eligible procedures. ECF 362-102.

Allergan raises several problems with Relator's methodology. First, and fundamentally, Allergan offers evidence that the Ethicon spreadsheet is not a comprehensive list of all surgeons qualified to implement REALIZE bands. Fifteen surgeons who were listed on Ethicon's surgeon Locator on November 6, 2014, are not included anywhere on the Ethicon spreadsheet. ECF 381-1 at 11. 55 additional surgeons appeared on Ethicon's Locator as REALIZE band surgeons as early as 2009, but never attended a training session and were not listed on the Ethicon spreadsheet. *Id.* Relator's attempt to infer that surgeons absent from the Ethicon spreadsheet did not perform any REALIZE procedures lacks sufficient evidentiary support.

Allergan also argues that the Ethicon spreadsheet is inadmissible hearsay. *Id.* at 11 n.6. Relator rejoins that the spreadsheet is subject to the hearsay exception for business records. ECF 389 at 28. Relator does not apply the elements of either Rule 803(6) or Rule 803(7), and specifically fails to provide evidence that the spreadsheet was kept as a matter of regular practice, falling short of his burden to show that it is possible to put this information in admissible form. *See* Fed. R. Civ. P. 56(c)(2); *Humphreys & Partners Architects, L.P. v. Lessard Designs, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015). Moreover, the spreadsheet was created in response to a discovery request issued in this lawsuit, which would seem to undermine Relator's assertion that it was created in the ordinary course of business. Even if it had been admissible, the substantive issues

4

with the Ethicon spreadsheet render it an inappropriate basis for inferring that any particular surgeon did not perform REALIZE procedures. Without more, the Ethicon spreadsheet is insufficient to create a genuine issue of material fact.

Next, Relator attempts to include all surgeons who were listed by an Allergan employee as having "100% LAP-BAND" practices on October 3, 2013, ("100% List") as having performed exclusively LAP-BAND procedures from 2008–2013. ECF 389 at 29–30; ECF 369 ¶ 27. The surgeons listed on the 100% List performed a total of 1,127 procedures. Allergan is right that there is very minimal information about the creation of the 100% List or how it should be interpreted. Having a 100% LAP-BAND practice on October 3, 2013 does not reflect a 100% LAP-BAND practice five years earlier. One doctor on the list, for example, performed both types of procedures during the relevant time-period. *See* ECF 396 at 9–10. The 100% List does, of course, make it more probable that a surgery performed around October of 2013 by a listed surgeon involved a LAP-BAND. This Court will accordingly deny summary judgment as to 28 procedures performed by surgeons on the 100% List in August through December of 2013. Otherwise, the List is insufficient to create a genuine issue of material fact that any particular procedure was a LAP-BAND procedure.

Lastly, and despite this Court's express rejection of such an approach, ECF 353 at 8–12, Relator asks this Court to conclude that some percentage of the total of CMS procedures were LAP-BANDs, based solely off of market share. As this Court has already explained, that is not a "surgeon-by-surgeon, claim-by-claim" argument. *Id.* at 10–11. This Court declines to reverse its position that market-share analysis is insufficient to prove that a particular surgery involved a LAP-BAND.

Accordingly, this Court agrees with Allergan that, with the exception of 100% LAP-BAND surgeons' surgeries performed in August through December 2013, there is no reliable indicator of whether a surgery was a LAP-BAND procedure other than the BRC data. Thus, only surgeries supported by BRC data and the limited time period surrounding the 100% List can survive summary judgment. The other categories of proof are too speculative to create a genuine issue as to whether a surgery was a LAP-BAND procedures. 890 procedures therefore remain for further analysis.

### b. Non-Medicare Surgeries

Relatedly, Allergan clarifies that many of the procedures identified by Relator did not result in any claim to Medicare because they were covered by private insurers through the Medicare Advantage program. As several other courts have noted, Medicare Advantage Organizations ("MAO") receive fixed monthly payments and do not submit claims to CMS for procedures. *See, e.g.*, *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, No. 18-cv-860, 2022 WL 3587358, at *2–3 (W.D. Mo. Aug. 22, 2022). Accordingly, those courts have found that a procedure involving an MAO can only serve as the basis for FCA liability where the actual diagnoses were false. *See, e.g.*, *United States ex rel. Rasmussen v. Essence Grp. Holding Corp.*, No 17-cv-3273, 2019 WL 13210596, at *4 (W.D. Mo. Dec. 10, 2019). Relator does not argue that the AKS "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Gibson*, 875 F.3d 179, 187 (5th Cir. 2017). Because claims to an MAO do not involve a payment from the government, they cannot give rise to FCA liability. This Court

accordingly finds that 119 MAO procedures included in the BRC data must be excluded, leaving 771 procedures to continue to analysis of the next factor.[2]

### 2. Icon-Period Surgeries

In late 2000s, the first version of Allergan's Locator included a number of different icons. One of those icons, the experience icon, had volume-based requirements. Relator's theory is that surgeons were incentivized to perform LAP-BAND surgeries to earn the "kickback" of the experience icon on the Locator. The experience icon was removed from Allergan's Locator around June of 2010, ECF 210-1 at 10, and Relator has clarified that he is only asserting "icon" claims, not "quota" claims, preceding July of 2010. ECF 353 at 7–8. After excluding non-LAP-BAND and non-Medicare procedures, as described above, only 39 surgeries performed by 7 surgeons remain from the icon period. While those 7 surgeons had the icon, this Court must assess the evidence that each surgeon knew of the criteria to earn or maintain the icon.

For Drs. Jeffrey Holloway, Kevin Huguet, and Benjamin Hung, Relator cites communications that relate to other icons, not the experience icon. Relator does not dispute this. ECF 389 at 15. As this Court has already noted, "it is unclear how Relator could establish that Allergan's use of [non-experience] icons 'sat in the causal chain' leading to any particular Medicare claim" ECF 353 at 2 n.2. In the relevant time frame before July 2010, no icon other than the experience icon has any apparent relation to the volume of procedures performed by a surgeon. Relator's arguments that non-experience icons are sufficient to show a surgeon's knowledge or incentivization are unavailing—no other icon had a volume requirement. Moreover, this Court has

---

[2] Once a procedure has been excluded using one factor, this Court will not consider whether it also could be excluded using another factor.

also already concluded that merely "knowing about [a] listing…is not enough to 'sit in the causal chain' without creating some plausible incentive for a surgeon to perform a LAP-BAND surgery." ECF 353 at 11. Relator has not adduced evidence that the non-experience icons provided any incentive to perform LAP-BAND procedures. This Court thus excludes surgeons where there is no evidence that they knew of the criteria for the experience icon.

Three more surgeons, Drs. Christina Richards, John Coon, and Milton Owens, never communicated with Allergan themselves; rather, staff members communicated with Allergan about the experience icon. Without any evidence that the surgeons themselves knew that they were on the Locators at all, much less that they were aware of any volume-based incentives, this Court cannot find Relator has created a genuine issue as to their knowledge.

The final surgeon requires a closer look. Dr. Jeff Rosen had an experience icon, and Relator has at least some evidence that he was aware of that icon. Allergan argues that Dr. Rosen should be excluded because although he was copied on emails from Allergan discussing his experience icon and its requirements, he did not reply. ECF 381-1 at 20–21. Although there is not particularly compelling evidence of Dr. Rosen's personal involvement with Allergan, Relator has adduced enough evidence to create a genuine issue of material fact on each of the four factors. Accordingly, summary judgment will be denied as to the two icon-period procedures performed by Dr. Rosen, and granted as to all other icon-period procedures because Relator has not adduced sufficient evidence of surgeon knowledge. 734 procedures remain.

### 3. Interim-Period Surgeries

In August 2011, Allergan announced new volume-based criteria to be placed on its Locator. Between July 2010, when the experience icon was removed, and July 2011, when the new criteria was announced ("the interim period"), there was no arguable kickback in place. Relator argues

8

that this Court should still count procedures during this interim period because it is possible that some "lingering effect" from the initial kickbacks persisted, citing an expert report that suggests gifts to physicians can have long-term impacts. ECF 389 at 24. As this Court has already explained, to survive summary judgment, Relator needed to adduce evidence that each surgeon knew of a kickback "at approximately the same time as a surgery." ECF 353 at 12.

Relator's theory of a sustained impact from icon-period kickbacks clearly falls short where he fails to offer sufficient proof of a surgeon's knowledge or causation during the icon period. Other than surgeries already excluded for other reasons, 39 procedures performed by 7 surgeons[3] occurred in the interim period, but 26 of those were performed by Drs. Hung, Richards, Holloway, Coon, and Huguet. Because Relator failed to establish those surgeons' knowledge during the icon period, is impossible for them to experience any lingering effect in the interim period.

That leaves 13 procedures performed by Drs. John Bagnato and Kim Marley in the interim period. The icon-period procedures performed by Drs. Bagnato and Marley did not survive the first step of this Court's analysis, because Relator has not adduced sufficient evidence that those surgeons' icon-period procedures were LAP-BANDs, not REALIZE bands. Further, neither surgeon had any communications with Allergan during the icon period regarding the experience icon or volume requirements, and thus their icon-period claims could also be excluded for lack of knowledge. Again, without an eligible icon-period procedure or any proof of icon-period knowledge, this Court cannot find that the alleged icon-period kickbacks had a continuing impact on Drs. Bagnato and Marley in the interim period.

---

[3] Although Allergan includes August 2011, procedures in its analysis, because the parties do not specify when in August Allergan communicated its criteria, this Court will not exclude any August procedures here, and will instead consider them as quota-period claims.

9

Accordingly, this Court will grant summary judgment as to all surgeries during the interim period between July 2010 and July 31, 2011. 695 procedures remain.

**4. Quota-Period Claims**

In July of 2011, Allergan first announced new "quota" requirements for surgeons to be placed on its Locator. The "quota period" lasted from August, 2011 until the end of 2013. Allergan argues that several categories of "quota" procedures should not survive summary judgment because Relator has failed to adduce sufficient evidence that surgeons had knowledge of the kickback.

    *a. Certification Spreadsheet Only*

Relator's primary proof of surgeons' knowledge of volume-based quota requirements is Allergan's "certification spreadsheet." The certification spreadsheet, which was created on October 17, 2011, includes a column labeled "confirmation," in which most of the listed surgeons have either an "x," "X," or "r" notation. The problem, as Allergan notes, is that no one knows what the column means, what the different letters mean, or how the certification spreadsheet was created. The only witness deposed regarding the process of collecting surgeon certifications was not familiar with the spreadsheet. ECF 381-1 at 23 (citing R-Ex 4, 32:16–17). Relator suggests that a third-party contractor collected responses and made the certification spreadsheet, but he has not offered any testimony from a person familiar with the creation of the certification spreadsheet, or any evidence of its context. *See* ECF 389 at 8. Nor has Relator explained the distinctions between the various marks in the confirmation column, instead suggesting that three distinct symbols mean the same thing. *Id.* at 9. Critically, there is no indication of who provided certification for a surgeon on the spreadsheet, when it was provided, or in what form. Relator

merely asserts that he "should be able to" authenticate the spreadsheet and confirm the meaning of its contents at trial.

Although Relator is right, of course, that the evidentiary standards are more relaxed at summary judgment than trial, the standards are not as relaxed as Relator urges. This Court may only consider "the content and substance of otherwise inadmissible materials where the party submitting the evidence shows that it will be possible to put the information into admissible form." *Humphreys & Partners Architects, L.P.*, 790 F.3d at 538. The spreadsheet is double hearsay—it is an out-of-court document, which Relator seeks to use for the truth of its contents, that is itself a collection of other out-of-court statements that Relator seeks to infer are true. Relator has not offered any evidence to support his assertion that the spreadsheet could be put in admissible form. *See id.* at 539 (movant adequately "explained the admissible form…anticipated" where he submitted declarations under penalty of perjury from persons who would testify at trial). Even if this Court were to assume that the certification spreadsheet is admissible, however, it is nowhere near sufficient to provide an independent basis for any procedure to remain in this lawsuit.

And although Relator has provided corroborating documents for about a quarter of the listed procedures, he offers no other evidence for over 200 of the surgeries on the certification spreadsheet. It would not be consistent with this Court's express requirement that proof be offered on a surgeon-by-surgeon, claim-by-claim basis to allow 66 surgeons to speak for 283. Moreover, some of the corroborating documents make clear that surgeons' staff members certified compliance with Allergan's quota, not the surgeons themselves. Relator does not dispute that corroborating evidence is largely missing, ECF 389 at 11, but suggests that this Court should infer that all surgeons received Allergan communications describing volume-requirements simply because some did. Again, that is not consistent with a surgeon-by-surgeon, case-by-case approach.

11

Without any corroborating evidence, or any proof of whether a surgeon personally certified her compliance with Allergan's criteria, this Court cannot conclude that the surgeon had the requisite knowledge of the criteria. Moreover, Relator's own deposition, in addition to those of seven other surgeons in this case, makes clear that at least some surgeons who were listed on the Locator were unaware of their listing, or of the Locator's requirements. ECF 396 at 18. The spreadsheet alone is insufficient to create a genuine issue of material fact as to causation for any particular surgery.

Summary judgment is granted as to the remaining surgeries for which Relator's sole evidence of knowledge is the certification spreadsheet. 270 procedures remain.

      b. *Staff certification*

Next, Allergan argues that procedures where a surgeon's staff members certified compliance on her behalf should be excluded. As discussed above, this Court cannot find a genuine issue of material fact as to a surgeon's knowledge where there is no evidence that the surgeon herself knew about a kickback. Relator attempts to apply principles of agency law to this situation, but a closer look reveals a poor fit. The crux of Relator's lawsuit is that *surgeons* were improperly motivated by kickbacks to order and perform LAP-BAND procedures on their patients. If a surgeon did not personally know about Allergan's volume-based criteria, it is impossible for the kickback to have influenced her decision to order a LAP-BAND surgery. Only the surgeon has the professional licensure necessary to decide what surgery to perform on a particular patient, not her staff members. Where, as here, the actual knowledge of the person making the decision of what procedure to perform is the deciding factor, it makes no sense to impute the employee's knowledge to the surgeon.

Relator's cited cases provide a helpful contrast. In *De Simone*, the defendants' employees took part in conduct that violated a previously issued injunction while acting within the scope of

their employment. *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 530 (4th Cir. 2022). The defendants argued that they were not aware of their employees' conduct, and the Fourth Circuit rejected that position, finding that the defendants had constructive knowledge of their employees' actions. *Id.* The Fourth Circuit also noted that "we impute knowledge to a principal when an agent is acting within the scope of their employment." *Id.* (citing *Helton v. AT&T, Inc.*, 709 F.3d 343, 356 (4th Cir. 2013)). But the Fourth Circuit did not provide any additional color on its statement. The *Helton* case further illuminates the meaning of the standard: AT&T was ultimately held liable for its employees' wrongful conduct under the general principal that employers can be held responsible for their employees' conduct. *Helton*, 709 F.3d at 356. Similarly, in *Regeneron*, the question was whether a corporation could be held liable for its employees concealing data that resulted in false claims. *United States v. Regeneron Pharms. Inc.*, Civ. No. 20-11217, 2023 WL 7016900, *14 (D. Mass. Oct. 25, 2023). The answer, of course, was yes. *Id.* In all of those cases, the knowledge that was imputed to the employer was of its employee's actions, not of everything its employee had ever known. Such a broad imputation of knowledge would not be reasonable in general, but would be particularly unreasonable in a case like this one, where the actual knowledge of the person who decided to perform a LAP-BAND operation is critical. The imputed knowledge in respondeat superior cases was never the knowledge necessary for the underlying claim to exist, but rather that necessary for an employer to be held liable for its employee's conduct.

The claim here is not that the employees did something wrong, and that their employers should be held liable for that wrongful conduct because they knew or should have known about

13

it.[4] Rather, the wrongful conduct alleged in this case could only have occurred where the same person was both aware of the kickback and made a treatment decision influenced by the kickback. Accordingly, there cannot be a genuine issue of material fact as to causation where the surgeon who performed a LAP-BAND procedure did not personally certify her compliance with Allergan's quota. When surgeons certified by staff members are removed, 254 procedures remain.

    c. *Proximate Causation*

Lastly, Allergan argues that three more categories of procedures should be excluded because there is insufficient proof that the kickback proximately caused the surgeon to perform a LAP-BAND procedure.[5] As this Court has noted previously, "[i]nducement is only plausible where the party intended to be induced is aware of the facts that might cause him to alter his behavior." ECF 353 at 10 n.4. Allergan attempts to add a fifth factor to this Court's test, arguing, essentially, that for various reasons it seems unlikely that the kickbacks actually impacted some surgeons' decision making. But everyone agrees that Relator is not required to prove that the

---

[4] Relator also has not adduced any individual evidence of the structure of these surgeons' practices, so it is unclear whether any particular surgeon was even the employer of staff members who provided the certification. It is possible, and perhaps likely, that many of the employees in question were employed by a corporation, LLC, or LLP, and not by any individual surgeon. This absence of evidence weakens any proposed inference that staff knowledge shows surgeon awareness.

[5] First, Allergan argues that surgeons who far exceeded Allergan's quotas should be excluded because the quota could not possibly have motivated their procedures beyond the 50 required to be placed on the Locator. Because there was not any additional benefit for performing surgeries beyond 50, Allergan argues that the kickback could not have motivated any procedure after the fiftieth. Allergan next suggests that surgeons who only performed LAP-BAND procedures should be excluded because if a surgeon's entire business was performing LAP-BAND procedures, she would have received a Locator listing regardless of the volume of procedures she performed. ECF 381 at 26. And third, Allergan argues that procedures performed more than six months or a year after a surgeon's knowledge date should be excluded because it is unlikely that she would remember about the kickback, or that it would continue to influence her.

kickbacks were effective. ECF 396 at 19. There is no requirement at this stage, at least, of actual inducement or proof of surgeons' motivations. All that Relator was required to do was raise a genuine issue of material fact as to whether the procedures resulted from the kickbacks. Allergan's proximate-cause arguments demand an assessment of motivations and impacts that is better left to a jury. Accordingly, this Court will not exclude any additional procedures for want of proximate cause.

### 5. Res Judicata

Allergan separately argues that "band-over-bypass" procedures—13 post-May 2012 procedures from 6 surgeons—should be excluded because the United States has already recovered for them in a 2018 settlement in *United States ex rel. Schwartz v. Allergan*. The settlement agreement in that case, ECF 82-12, covered cases where Allergan induced healthcare providers to install LAP-BANDs using a "band-over-bypass" icon. *Id.* at 3. If the government (or any relator) has already recovered for a surgery, even under a different theory, Relator cannot recover again in this case for the same procedure. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999); *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998). The *Schwartz* settlement expressly excluded the claims alleged in the First Amended Complaint ("FAC") in this lawsuit. ECF 82-12 at 9. However, it is unclear from the record before the Court at this stage whether the 13 surgeries were included in the FAC under the quota theory. The *Schwartz* settlement agreement does not include a list of what surgeries it covered. Without more, this Court cannot conclude that the government has already recovered for the 13 procedures and declines to grant summary judgment on this basis.

## II.   CONCLUSION

For the reasons stated above, Allergan's renewed motion for summary judgment is granted in part and denied in part. Relator's claim as to 254 procedures, which are identified in an appendix to this opinion, will proceed. A separate Order follows.


Dated: January 15, 2025                                          /s/
                                                         Stephanie A. Gallagher
                                                         United States District Judge